IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

ROBERT HOHMAN,                    )
                                  )
                Plaintiff,        )
                                  )
        v.                        )    Case No.
                                  )    14-3229-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting         )
Commissioner of Social Security,  )
                                  )
                Defendant.        )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Hohman seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act"). I find that the substantial evidence in the record as a

whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's

motion for summary judgment will be denied and the decision of the Commissioner will

be affirmed.

## I.    BACKGROUND

On August 22, 2011, plaintiff applied for disability benefits alleging that he had

been disabled since June 22, 2010, due mainly to shoulder problems and peripheral

neuropathy (Tr. at 90). This application was filed about 5 weeks after the Appeals

Council denied plaintiff's request for review in a prior disability case which had been

denied by an administrative law judge. This most recent application was denied on

December 9, 2011. On April 11, 2013, a hearing was held before an Administrative

Law Judge. On May 14, 2013, the ALJ found that plaintiff was not under a "disability"

as defined in the Act. On March 20, 2014, the Appeals Council denied

plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

3

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Weaver, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1974 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1977 | $ 394.46 | 1995 | $ 33,624.79 |
| 1978 | 955.16 | 1996 | 32,013.10 |

4

| | | | |
|---|---|---|---|
| 1979 | 172.93 | 1997 | 35,645.65 |
| 1980 | 1,846.44 | 1998 | 47,342.50 |
| 1981 | 3,864.64 | 1999 | 39,178.02 |
| 1982 | 2,429.11 | 2000 | 49,023.22 |
| 1983 | 658.76 | 2001 | 47,345.18 |
| 1984 | 6,824.25 | 2002 | 50,910.42 |
| 1985 | 7,944.87 | 2003 | 56,287.18 |
| 1986 | 11,128.67 | 2004 | 42,988.16 |
| 1987 | 12,564.19 | 2005 | 35,208.92 |
| 1988 | 20,555.76 | 2006 | 46,136.61 |
| 1989 | 21,032.87 | 2007 | 9,981.14 |
| 1990 | 25,182.89 | 2008 | 0.00 |
| 1991 | 17,948.67 | 2009 | 0.00 |
| 1992 | 30,220.58 | 2010 | 0.00 |
| 1993 | 32,572.81 | 2011 | 0.00 |
| 1994 | 34,390.49 | 2012 | 0.00 |

(Tr. at 104-105, 107-108).

**Work Activity Report (Self-Employed Person)**

In a Work Activity Report dated August 24, 2011, plaintiff reported working as a pastor for a church (Tr. at 110-112). When asked to list any months in which he earned more than $200, he responded, "All the money goes to the church. They only provide me housing and ministerial dues." Plaintiff was asked if he made management

5

decisions after his illness or injury.  He responded, "yes", and wrote, "I still make all the decisions with the church."  Plaintiff reported that he spends 4 to 8 hours per week preparing his sermons, 1 hour per week in counseling sessions, 2 to 3 hours per week on visitations, and 2 to 3 hours every two weeks going to the hospital for visitation.  He noted that he starts "6AM-8:30PM" on Sundays.  This means he works somewhere between 7.5 and 13.5 hours per week in addition to the "6AM-8:30PM" on Sundays.  He gets no money from the church for preaching, "[t]hey only pay for my ministerial dues and my housing.  This is paid as self employment."

This was found not to be substantial gainful activity (Tr. at 113).  He "alleges working a total of 22.5 hr/week at the low end of his estimates."

**Function Report - Adult**

In a Function Report dated September 5, 2011, plaintiff described his day as follows:

> Eat breakfast, dress, read and/or study, attend classes, do homework, do visitation (with sick or invalids), do online education courses, watch documentaries, read news, teach classes (free substance abuse classes), make phone calls.

 (Tr. at 142-149).

He transports his kids to school or to appointments and helps them with their schoolwork as he is able.  Plaintiff has no problems with self care.  He goes outside 2 to 3 times per day, walking, driving a car, or riding in a car, and he is able to go out alone. He shops in stores and by computer for groceries, household items and electronic parts, and he is able to shop for 20 to 30 minutes at a time once a week.  He is able to

6

pay bills, handle bank accounts, and count change.  He does not need any special reminders for personal needs or taking medication.  He prepares his own meals for 5 to 10 minutes at a time 2 or 3 times a week, which is the same as before his injury or illness.  Plaintiff is able to water plants, change light bulbs, make beds, fold laundry, dust, and do light sweeping.  His hobbies include reading the news and the Bible daily, playing guitar, watching sports and the history channel daily, hunting (with numerous adjustments) and fishing (rarely).  All non-sedentary hobbies are done infrequently.

Plaintiff spends time with others at school, church, talking, eating, praying, teaching and counseling 4 to 5 days per week.  Plaintiff attends church 2 days per week, school 3 days per week, and classes 2 nights per week.  He has no problems getting along with others.  His impairments do not affect his ability to remember, concentrate, understand, follow instructions, or get along with others.  He can pay attention for 10-15 minutes, but he is able to finish what he starts.  He follows instructions "pretty well."

Plaintiff gets depressed thinking about what he cannot do. He has a fear of not being able to provide for his family, "fear of inability or difficulty in changing vocations, if it is even possible." (Tr. at 148).

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated September 5, 2011, plaintiff reported that he can play video games, use a computer or do puzzles for 15 to 20 minutes at a time with frequent position changes (Tr. at 150-152).  Plaintiff's wife helped him fill out his disability forms because, "she writes more neatly and faster."

**Work History Report**

On September 5, 2011, plaintiff completed a Work History Report (Tr. at 153-164). He reported that his job as a pastor involves visiting and praying with the sick, studying, preparing sermons, delivering sermons, and teaching lessons. He supervises 2 to 3 people.

> In ministering, many things are required; although not always behind the pulpit. In addition to preparing for messages and delivering the sermons, I am needed to pray with and for people. I also teach lessons and counsel before and after services. Many times, during days when I am not at the church, I am needed to visit the sick, the elderly, or invalids. The duties, hours, and total hours/day in accomplishing each task varies and cannot be adequately described or calculated.

**Function Report - Third Party**

In a Function Report dated September 5, 2011, plaintiff's wife reported that his condition does not affect his ability to understand, follow instructions, complete tasks, remember, concentrate, or get along with others (Tr. at 173). His condition does not affect his ability to climb stairs, kneel or bend. He is able to follow written and verbal instructions "fine." Mrs. Hohman wrote that plaintiff does not handle changes in routine well: "Needs schedule of some kind to accomplish regular tasks. Gets stressed if routine is disrupted to a great degree." (Tr. at 174).

Plaintiff's wife wrote that plaintiff has some depression over the fear of being unemployable and "vocational change at mid-life." (Tr. at 174).

**Report of Contact**

In a Report of Contact dated December 9, 2011, Kathryn Holmes of Disability Determinations noted that plaintiff was taking classes at the college campus (Tr. at

176).

He reported that he also participated in classes that are called, "hybrid," where he attends the physical campus for class, and then must do more work on the internet at home. He reported that one such class that was a "hybrid" was his general sociology class. He reported that he is taking almost 10 credit hours this semester. He stated that he had dropped one class because he was not doing well in the class. He reported that he attends classes on the campus Tuesday, Wednesday, and Thursday. He stated that he will also be taking 10 credit hours of classes next semester, too.

He continued to state that he continues to teach his drug and alcohol classes at night. He stated that he teaches 1-2 classes a week. Each class is reported to last an hour or two, as it varies. He stated that he has another person that helps him teach the classes, and is able to sit or stand during each class.

He reported that his only hobbies consisted of metal detecting. He then reported, however, that he has not been able to metal detect in 5 years. DDS inquired with the claimant about current hobbies. He reported that his hobbies were fishing, hunting, bowling from time to time, archery, and golf. He added that he does not golf anymore because he is not very good at it. DDS then inquired with the claimant about how often he participates in his hobbies. Claimant quickly corrected himself and reported that the only hobby he is able to do is fishing because he is able to sit and stand as needed.

DDS inquired about the claimant's current job as a pastor. He stated that the job entails him [teaching] bible study on Wednesday nights, Sunday mornings, and Sunday evenings. He stated that he has someone to help him teach bible study as well, and the job is flexible with sitting and standing.

**Disability Report - Adult**

In an undated Disability Report, plaintiff stated that he earned a GED in 1997 and was certified through the State of Missouri for Substance Abuse Counseling in October 2010, which is after his alleged onset date (Tr. at 129).

**B.    *SUMMARY OF TESTIMONY***

During the April 11, 2013, hearing, plaintiff testified; and Denise Weaver, a vocational expert, testified at the request of the ALJ.

1.    **Plaintiff's testimony.**

At the time of plaintiff's alleged onset date he was 49 years of age (Tr. at 29).  At the time of the hearing plaintiff was 51 years of age and he is currently 53 (Tr. at 29). He is 6 feet tall and weighs 247 pounds (Tr. at 29).  Since his injury he has gained "40 plus pounds" due to inactivity (Tr. at 30).  Plaintiff is left-handed (Tr. at 30).

Plaintiff has been married for 26 years (Tr. at 30).  He has four children and three grandchildren (Tr. at 30).  Plaintiff lives with his wife, his 20-year-old daughter and his 16-year-old son (Tr. at 30).  Plaintiff lives in a house with stairs leading up to his daughter's bedroom; there are three steps leading up to the front door (Tr. at 31).

Plaintiff drove to the administrative hearing (Tr. at 31).  It was a 50-mile trip, but he stopped for a ten-minute break during the drive (Tr. at 31).  He has peripheral neuropathy and he cannot feel the pedals in the vehicle so he has to get out and walk around and move his feet some (Tr. at 31-32).  Plaintiff has no source of income (Tr. at 32).  His family gets food stamps and he gets emergency monetary help from the church where he works as a pastor[1] (Tr. at 32).  He does not get a salary from the church (Tr. at 32).  Plaintiff is not covered by Medicaid, he did receive worker's compensation until 2010 but no longer does, and he does not receive unemployment

---

[1]In his application plaintiff stated that his church pays $675.00 of his $862.11 monthly mortgage, heating fuel, water, gas, property insurance, property taxes, electricity, garbage removal and sewer bills, and that he does not expect these arrangements to change (Tr. at 91).  He also listed $7,148.00 in gross earnings from self employment as a pastor of a church; however, those earnings do not appear on plaintiff's Social Security earnings record (Tr. at 92, 104).

benefits (Tr. at 32-33). Plaintiff's wife does part-time writing for a local newspaper in Dixon (Tr. at 33).

Plaintiff has a high school education and one year of college (Tr. at 33). He attended college from 2011 to 2012 but "concentration wise, physically wise, it became impossible." (Tr. at 53). He worked as a union painter, taper and wallpaper hanger for 22 years (Tr. at 33, 37). He was injured on the job and last worked there in February 2007 (Tr. at 37). "Through the course of doing the job," he tore his rotator and superior labial ligament resulting in three surgeries (Tr. at 37). During the third surgery, the surgeon removed the ligament completely and inserted it into his arm bone, "and from that point on, it was over. My career was over." (Tr. at 37). The surgeon told plaintiff he would need a partial or full shoulder replacement within 2 to 2 1/2 years after that last surgery (Tr. at 55).

Plaintiff cannot work because of constant pain in his knees; peripheral neuropathy in his shoulder and back; an inability to concentrate; and the need to move around, lie down, sit still for a while, or do whatever he needs to do to alleviate his pain as much as possible (Tr. at 34). Plaintiff's condition, especially his ability to lift, has gotten progressively worse over the past two or three years (Tr. at 54). Plaintiff does not have a job now but he works as a pastor (Tr. at 34). On Sunday mornings he presents the service with help from others, and the service involves Bible teaching for one to two hours (Tr. at 34). He spends 45 minutes to an hour preparing a sermon (Tr. at 34). During the service, he is able to stand, sit or walk as needed (Tr. at 35). He occasionally makes hospital visits, he officiates at about one funeral a year and about

one wedding a year (Tr. at 35).  Plaintiff is at the church on Wednesday and Sundays for services (Tr. at 35).  There is a one-hour Bible study on Wednesdays (Tr. at 35).

Plaintiff teaches a substance abuse program and an anger management program (Tr. as 36).  He only does that once a week now -- he has other people who take care of the other classes for him (Tr. at 36).  The classes are held in the church building (Tr. at 36).

Plaintiff tried to go back to work in construction after his surgeries, but he was unable to do that kind of work anymore (Tr. at 37).  He was asked if he had looked for any other kid of work:  "Sure I did, but nothing can -- I can't keep -- with my, the pain, the constant trying to keep my thoughts together, there's just no way you can do it full-time.  You, you can't do it." (Tr. at 37).  Plaintiff experiences pain from his shoulders to his feet (Tr. at 48).  He had the shoulder surgeries, he has a pinched nerve in his lower back, he has a ruptured disc at T7, and he has had 2 knee surgeries (Tr. at 48).  He is in pain all day every day (Tr. at 48).  Nothing makes his pain better except a hot bath or shower which alleviates some of his pain (Tr. at 48-49).  Activity aggravates his pain (Tr. at 49).  Plaintiff has not seen a doctor or gone to a hospital because he does not have insurance (Tr. at 49).  Plaintiff has neuropathy which affects him from the bottom of his feet to just below the knees (Tr. at 49).  He feels burning, tingling, pain and numbness (Tr. at 49).  If his leg goes numb, he will try to move it but if it does not want to work, he ends up banging it into something (Tr. at 49).

Plaintiff gets up any time between 5:30 and 9:00 in the morning, depending on how the night before went (Tr. at 38).  He has problems sleeping due to pain and

peripheral neuropathy (Tr. at 38). He gets up and walks around a little, sits down, tries to relax, sits in a recliner for a while, and tries lying on his stomach and his back until he can go back to sleep (Tr. at 38). Plaintiff bathes, dresses, eats breakfast, tries to do a little reading, checks his email, and then does what he can around the house (Tr. at 38-39). Plaintiff has a cellular telephone and a computer with an email address which he uses to send and receive emails (Tr. at 33). He reads the Bible, he reads news, he reads things related to his work in substance abuse counseling (Tr. at 39). Plaintiff does not own a television set (Tr. at 39). Plaintiff sits at his computer for 5 to 10 minutes at a time, checking his email and reading the news (Tr. at 39). He talks to people on the phone and sends text messages (Tr. at 39). Plaintiff tried to go deer hunting once in the last year -- he bought a cushion and tried to sit on the ground but it did not work (Tr. at 40). He did not get a deer (Tr. at 40). Plaintiff did not go deer hunting the year before (Tr. at 40). Plaintiff last went fishing 4 or 5 years ago (Tr. at 41). He last went metal detecting in 2007, last played golf in 2006 (Tr. at 41). He tried to play the guitar earlier in the year but it was too painful (Tr. at 42). He eats out occasionally (Tr. at 42). He occasionally plays board games with his family (Tr. at 42). When he can, he attends family events (Tr. at 42).

Plaintiff's son plays baseball and basketball and he is an Eagle Scout (Tr. at 42-43). Plaintiff attends his son's baseball and basketball games when he can (Tr. at 43). Plaintiff goes shopping once every 8 months or so (Tr. at 43-44). Plaintiff vacuumed about three months ago to help out his wife (Tr. at 45). Plaintiff drives to and from church which about 2 blocks from his house (Tr. at 45). He recently drove to a

parishioner's home and spent about 45 minutes with her after her husband passed away (Tr. at 46). Plaintiff does not smoke, drink or use illegal drugs (Tr. at 46).

Plaintiff can sit for 15 to 20 minutes at a time but still has to move his back and move his legs while he is sitting (Tr. at 49). He can stand still for about 5 minutes but it is still painful (Tr. at 50). He can lift maybe up to 4 pounds (Tr. at 50, 52). He has problems with any type of rotation of his arms, lifting, raising his arms, pushing or pulling (Tr. at 50). When his worker's compensation doctor released him, he had permanent restrictions: He was not to sit in one spot or stand longer than 6 1/2 minutes; he could lift a maximum of 5 pounds from the floor to his waist or from his waist to his shoulder, but he was to do no lifting above shoulder height; and he was to push or a pull a maximum of 10 pounds (Tr. at 50). Plaintiff cannot maneuver stairs -- he cannot feel his feet on the step (Tr. at 51).

Plaintiff does not take any prescription medications (Tr. at 47). He has not checked into any places like Wal-Mart that offer $4 prescriptions (Tr. at 47). Plaintiff takes over-the-counter Ibuprofen or Naproxen which works with his peripheral neuropathy -- the numbness, burning and tingling in his feet (Tr. at 47). Plaintiff last took prescription medication right after his last surgery (Tr. at 47). Plaintiff used to be a drug addict, and he does his best never to use "anything in that area." (Tr. at 48). Gabapentin used to help, but once his worker's compensation benefits ran out he was no longer able to get that prescription (Tr. at 48). Plaintiff has not tried to get help with medications through any community-based resources (Tr. at 48). It is unclear how long plaintiff was covered by Medicaid:

14

Q.    Well I thought there was a note that you had gotten Medicaid?

A.    Yeah, I did get to go see, actually -- they -- I didn't even get to see the doctor, they just took some blood tests. That's all they did was take blood. When I, I reapplied for the MO Health within the last 30 days (Tr. at 51). Plaintiff testified that he has never really been prescribed pain medication (Tr. at 51). "[A]t this point in my life, I don't want to take that risk. I don't want to take the risk of going back into addiction. So, I do my best to live with the pain." (Tr. at 51-52). Plaintiff testified he had not used illegal drugs in more than 26 years (Tr. at 46). At the time of the hearing plaintiff had an application for Medicaid pending (Tr. at 52).

## 2.    Vocational expert testimony.

Vocational expert Denise Weaver testified at the request of the Administrative Law Judge. Working as a minister falls under DOT 120.107-010, clergy member, which is light work with an SVP of 8 (Tr. at 56). A teacher in adult education is DOT 099.227-030, which is light with an SVP of 7 (Tr. at 56). His previous job as a painter is DOT 840.381-010, medium with an SVP of 7 (Tr. at 56).

The first hypothetical involved a person limited to light work who could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; may occasionally balance, stoop, crouch, and reach with the left arm; may never kneel or crawl; must avoid concentrated exposure to extreme heat, extreme cold, vibration and hazards (Tr. at 56-57). Such a person could work as a clergy member (Tr. at 57). The person could also work as a bailiff, DOT 377.667-010, light with an SVP of 3 (Tr. at 57). There are 100,000 such jobs in the country and 1,700 in Missouri (Tr. at 57). The

Case 6:14-cv-03229-REL   Document 21   Filed 07/13/15   Page 15 of 39

person could work as a case aide in the social services industry, DOT 195.36-010, light with an SVP of 3 (Tr. at 57). There are 30,000 such jobs in the country and 750 in Missouri (Tr. at 58). The person could work as a museum attendant, DOT 109.367-010, light with an SVP of 3 (Tr. at 58). There are 30,000 such jobs in the country and 900 in Missouri (Tr. at 58).

The second hypothetical was the same as the first except the person would be off task about 20% of the time (Tr. at 58). Such a person probably could not hold a job (Tr. at 58).

The third hypothetical was the same as the first except the person would be limited to unskilled work (Tr. at 59). The person could work as a counter clerk, photo finishing, DOT 249.366-00, light with an SVP of 2, with 21,000 jobs in the country and 450 in Missouri (Tr. at 59-60). The person could be a boat rental clerk, DOT 295.467-014, light with an SVP of 2, with 400,000 in the country and 6,000 in Missouri (Tr. at 60). The person could be a laminating machine offbearer in the wood products industry, DOT 569.686-046, light with an SVP of 2, with 300,000 in the country and 6,000 in Missouri (Tr. at 60).

## C.  SUMMARY OF MEDICAL RECORDS

On July 9, 2009, plaintiff saw Joseph Sims, D.O., for an annual check up (Tr. at 206). He weighed 232 pounds. After performing a physical exam, Dr. Sims found that plaintiff was a "healthy adult male." He told plaintiff to begin a progressive daily aerobic exercise program; follow a low fat, low cholesterol diet; and attempt to lose weight.

16

On February 15, 2010, plaintiff saw Jeffrey Karls, D.O., for back and foot pain (Tr. at 224-227). "Thoracic back pain worsening over last 3-4 months." Plaintiff weighed 241 pounds. He complained of paresthesias[2] to his toes extending across the dorsum of his feet bilaterally for the past 4 months. On exam, Dr. Karls noted that plaintiff had "no lower extremity paresthesias." Plaintiff's blood sugar was 122 in the office. "We discussed neuropathic pain[3] extensively. We discussed peripheral paresthesias."

June 22, 2010, is the date of denial in plaintiff's last disability case and his alleged onset date in this case.

On September 22, 2010, plaintiff had a hemoglobin A1C[4] which was high at 6.4

_____

[2]A tingling, "pins and needles" sensation.

[3]"Peripheral neuropathy, a result of damage to your peripheral nerves, often causes weakness, numbness and pain, usually in your hands and feet. It can also affect other areas of your body. Your peripheral nervous system sends information from your brain and spinal cord (central nervous system) to the rest of your body. Peripheral neuropathy can result from traumatic injuries, infections, metabolic problems, inherited causes and exposure to toxins. One of the most common causes is diabetes mellitus. People with peripheral neuropathy generally describe the pain as stabbing or burning. Often, there's tingling. In many cases, symptoms improve, especially if caused by a treatable underlying condition. Medications can reduce the pain of peripheral neuropathy."
http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948

[4]"The A1C test is a common blood test used to diagnose type 1 and type 2 diabetes and then to gauge how well you're managing your diabetes. . . . The A1C test result reflects your average blood sugar level for the past two to three months. Specifically, the A1C test measures what percentage of your hemoglobin -- a protein in red blood cells that carries oxygen -- is coated with sugar (glycated). The higher your A1C level, the poorer your blood sugar control and the higher your risk of diabetes complications."
An A1C of 6.0 indicates an average blood sugar of 126; an A1C of 7.0 indicates an average blood sugar of 154.
http://www.mayoclinic.org/tests-procedures/a1c-test/basics/definition/prc-20012585

(normal is 4.0 - 6.0) (Tr. at 228-229).

On October 18, 2010, plaintiff was seen at St. John's Clinic by Bashar Mohsen, M.D., for an EMG[5] study due to complaints of back pain and lower extremity numbness (Tr. at 196-198). Dr. Mohsen noted that plaintiff was borderline diabetic. He found that plaintiff's EMG was consistent with lower extremity sensory motor polyneuropathy which "could be due to metabolic abnormality." He noted partial nutrition deficit and electrophysiological evidence of left L4-L5 lumbar radiculopathy.[6]

---

[5]"Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons). Motor neurons transmit electrical signals that cause muscles to contract. An EMG translates these signals into graphs, sounds or numerical values that a specialist interprets. An EMG uses tiny devices called electrodes to transmit or detect electrical signals. During a needle EMG, a needle electrode inserted directly into a muscle records the electrical activity in that muscle. A nerve conduction study, another part of an EMG, uses electrodes taped to the skin (surface electrodes) to measure the speed and strength of signals traveling between two or more points. EMG results can reveal nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission." http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014183

[6]"Lumbar radiculopathy refers to disease involving the lumbar spinal nerve root. This can manifest as pain, numbness, or weakness of the buttock and leg. Sciatica is the term often used by lay people. Lumbar radiculopathy is typically caused by a compression of the spinal nerve root. This causes pain in the leg rather than in the lumbar spine, which is called 'referred pain.' . . . Lumbar radiculopathy symptoms may include pain, tingling, numbness, weakness, and reflex loss. Lumbar radiculopathy symptoms may present in the leg and foot. Interventional treatments for lumbar radiculopathy may include:
• Physical therapy and/or exercises that are designed to stabilize the spine and promote a more open space for spinal nerve roots. . . .
• Medications, such as non-steroidal anti-inflammatory drugs (NSAIDs) to reduce swelling and pain and analgesics to relieve pain.
• Epidural steroid injections and nerve root injections to help reduce swelling and treat acute pain that radiates to the hips or down the leg.
Surgical treatment can be varied depending on what causes the lumbar radiculopathy." http://www.emoryhealthcare.org/spine/medical-conditions/lumbar-radiculopathy.html

On December 29, 2010, plaintiff saw Dr. Karls to go over the results of his EMG (Tr. at 230-231). Plaintiff weighed 236 pounds. "[A]ccording to the EMG he has an L4-L5 left radiculopathy although patient has minimal if any discomfort in the lower back. Patient also was suspected of having a metabolic problem causing this according to the report however patient is not a diabetic." Dr. Karls performed a physical exam. "He has minimal discomfort on deep palpation of the L4-L5 lateral transverse processes on the left. Patient continues to have some discomfort more in the thoracic spine on palpation. . . . Subjectively he has some paresthesias and discomfort involving the balls of both feet and distally to the toes." Plaintiff was assessed with nonspecific peripheral neuropathy. He was prescribed Neurontin[7] (also called Gabapentin) and Naprosyn[8] (also called Naproxen).



On September 22, 2011, plaintiff saw John Demorlis, M.D., for an examination in connection with his disability application (Tr. at 250-257). Dr. Demorlis observed that

---

[7]Treats nerve pain.

[8]Non-steroidal anti-inflammatory.

Case 6:14-cv-03229-REL   Document 21   Filed 07/13/15   Page 19 of 39

plaintiff had a normal gait without assistive device.

Plaintiff's shoulder flexion was

normal on the right.  On his left arm, he had 90°

active range of motion and 100° passive range of

motion (150° is normal).  Abduction was normal on

the right.  On his left arm he had 90° active range of

motion and 100° passive range of motion (150° is

normal).  Adduction was normal on both arms.  Elbow





range of motion was normal on both

arms.  Wrist range of motion was

normal on both arms.  Knee range of

motion was normal on both legs.  He

had normal grip strength on both

hands, and normal upper extremity

strength on both arms.  Hip, ankle, cervical spine and lumbar spine range of motion was

all normal.  He had normal strength in both legs.  Plaintiff's ability to heel and toe walk,

squat, and get on and off the exam table was normal.  His gait and station were normal.

> This is a 49 year old, obese, left-handed man wearing a sad face that comes in for a disability physical.  He moves around easily and does favor his left shoulder. . . .  He is preoccupied, impoverished, talkative and has poor eye contact.

> When asked about arthritis of the shoulder, that was diagnosed roughly 2007. . . .  His pain has progressively gotten worse, more likely than not due to traumatic arthritis.

20

When asked about his back, he claims that he had a ruptured T7 disc back in 2001 found by MRI at St. John's in St. Louis. No surgery. He was told to do physical therapy but he had to work and wanted to do so. He sounds as though he has developed traumatic arthritis there as well. He says his pain level can be four or five but when the weather is damp and cold it's seven or eight.

When asked about lumbar radiculopathy and peripheral neuropathy, I'm not sure what's happening here. He had "needle tests," probably nerve conduction studies. He claims that his feet can be numb and they can burn yet today at time of exam he says they feel perfectly normal. Lying down seems to help, sitting seems to be worse. I'm not sure what the cause of this is.

Functionally, patient claims he can walk 1/2 block due to low back pain. He claims he can stand "45 seconds" due to back pain. He certainly stood longer than that here. He claims he can sit 5 to 10 minutes due to back pain. He sat longer than that here during my exam and interview. He claims he can ride in a car about 45 minutes due to low back pain. He can carry/lift 5 to 10 pounds with the left arm because of physician's order.

PAST HISTORY: . . . He has had arthroscopic procedures of both knees. He has full range of motion.

CURRENT MEDICATIONS: Ibuprofen . . . .

EDUCATION: Mr. Hohman received his GED in 1991 and he is trying to better himself currently. He is in East Central College, starting in August 2011. He is going for his Associates Degree in Science and also in Substance Abuse Counseling. I believe he is a part-time pastor at the same time.

* * * * *

HABITS: Mr. Hohman has a remote history of tobacco, alcohol and illicit drugs but this was basically as a youth.

* * * * *

REVIEW OF SYSTEMS: . . . He has gained 40 pounds due to inactivity. . . .

PHYSICAL EXAM: Reveals a man that is pleasant, cooperative, impoverished, preoccupied, quite talkative and has poor eye contact. He stands 71.5 inches tall, weighs 247 pounds. . . .

21

EYES:  Right eye "65% blind", lazy eye.  Both eyes together vision is 20/20.  He does have a lazy right eye. . . .

BACK:  +1 tenderness around the mid-back.  No spasm.  Toe touch is greater than 90 degrees.  Lateralization is full.  He has negative straight leg raises.

* * * * *

ABDOMEN:  . . .  He has . . . a small umbilical hernia. . . .

* * * * *

IMPRESSION:   1)   Chronic left shoulder pain - more likely than not due to traumatic arthritis
              2)   Post three left shoulder surgeries
              3)   Chronic back pain without evidence of radiculopathy
              4)   Depression
              5)   Post bilateral arthroscopic procedures on the knees
              6)   Lazy right eye
              7)   Vision deficit
              8)   Small umbilical hernia

On December 9, 2011, Stanley Hutson, Ph.D., completed a Psychiatric Review Technique finding plaintiff's mental impairment not severe (Tr. at 258-268).  He found that plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace.  In support of his findings, Dr. Hutson wrote, "The claimant did not allege mental impairments upon filing claim. Medical records do not indicate a history of mental impairments.  Claimant is not taking medication for mental impairments and has never been hospitalized for mental impairments.  Physician CE [consultative exam] with Dr. Demorlis on 09/22/2011 noted impression of depression. The claimant appeared to be preoccupied, impoverished, and had poor eye contact.  He has a GED and is attending East Central College to pursue an Associate's degree.  ADL form completed by the

22

claimant on 09/05/2011 did not allege significant limitations due to mental impairments. His possible depression does not cause severe limitations."

On March 15, 2013, plaintiff saw Jabeen Salma, M.D., for a DFS evaluation (Tr. at 271-273). "He has a known history of peripheral neuropathy and lumbar radiculopathy that was documented on EMG done in 2010. EMG study was conducted by a neurologist. He states that his symptoms have been progressively worsening. He has been unable to afford insurance, and thus has neglected obtaining treatment. His prior PCP had tried gabapentin, which did not help with his symptoms. He states that he is afraid that he will lose his footing, has pins and needle sensation in both legs, symptoms are worse when standing for long periods of time, and when climbing and descending stairs. He intermittently gets chronic back pain, has not been taking anything over-the-counter for pain control. Plaintiff weighed 240 pounds. "He does have evidence of neuropathy [on] examination, DTRs wnl [deep tendon reflexes[9] within normal limits]. Mild tenderness over the lumbar spine upon palpation." Dr. Salma assessed peripheral neuropathy and lumbar radiculopathy.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Mary Leary entered her opinion on May 14, 2013 (Tr. at 9-19). The ALJ noted that plaintiff had filed a previous application for disability benefits alleging an onset date of June 22, 2010. That claim was denied by an

---

[9]A brisk contraction of a muscle in response to a sudden stretch induced by a sharp tap by a finger or rubber hammer on the tendon of insertion of the muscle. Absence of the reflex may be caused by damage to the muscle, peripheral nerve, nerve roots, or spinal cord at that level.

administrative law judge and affirmed by the Appeals Council. Because plaintiff did not appeal that denial, the period prior to June 22, 2010, is subject to res judicata (Tr. at 9). Plaintiff's last insured date was December 31, 2012 (Tr. at 11).

Step one. Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of June 22, 2010, through his last insured date (Tr. at 11). He worked during this time as a minister; however, that work was not substantial gainful activity (Tr. at 11).

Step two. Plaintiff suffers from the following severe impairments: lower extremity sensory motor polyneuropathy, lumbar radiculopathy, chronic rotator cuff tear with AC joint arthritis, and obesity (Tr. at 11). Plaintiff's depression, lazy right eye and small umbilical hernia are not severe impairments (Tr. at 12-13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13-14).

Step four. The ALJ found that medical evidence from Exhibits B8F through B15F does not pertain to the relevant period in the present case because those records do not contain new and material evidence and are therefore subject to res judicata (Tr. at 15). This includes records from Springfield Surgical Specialists dated February 23, 2007 through May 19, 2008 (B8F), records from Orthopaedic Specialists of Springfield dated April 9, 2007, through June 18, 2008 (B9F), records from Missouri Baptist Hospital dated June 2, 2008, through July 14, 2008 (B10F), records from James Emanuel, M.D., dated June 19, 2008, through February 17, 2009 (B11F), records from Parkcrest Orthopedics dated June 2, 2008, through February 17, 2009 (B12F), records

from Thomas Musich, M.D., dated May 5, 2009 (B13F), records from James Emanuel, M.D., dated October 20, 2009 (B14F), and records from Jacques Van Ryan, M.D., dated April 8, 2010 (B15F). Plaintiff's allegations are not entirely credible in part because he went two years without seeking any medical treatment, the medical evidence does not indicate that his condition worsened, he does not take prescription medications but relies on over-the-counter pain relievers, and he relies on rest and warm baths to alleviate his pain (Tr. at 16). His explanation of lack of funds is not entirely persuasive because he had not looked into sliding-scale community clinics, low-cost prescription plans, or resources available through agencies such as the county health department (Tr. at 16).

Plaintiff retains the residual functional capacity to perform light work except he can only occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch or crawl; can only occasionally reach with the left upper extremity; and must avoid concentrated exposure to extreme cold, heat, vibration and hazards (Tr. at 14). With this residual functional capacity, plaintiff cannot perform his past relevant work as a painter (Tr. at 17)

Step five. Plaintiff is capable of performing other jobs such as bailiff, case aide, or museum attendant, all available in significant numbers (Tr. at 18). Therefore, plaintiff is not disabled (Tr. at 19).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

There is nothing in the medical records that [contradicts] the Plaintiff's suffering from [his shoulder condition and midline focal disc protrusion at T7-T8], and none of the Plaintiff's treating physicians or the medical source opinions on record ever documented the complaints as unfounded. Plaintiff's testimony was consistent with the records as a whole showing that his condition had worsened. . . . He has been able to spend probably eight to ten hours a week doing pastoral work and some of those duties now take longer - for example, writing even a page. He does some driving, but his wife does most of it because of his left shoulder and back pain.

Contrary to plaintiff's argument, there is nothing in the record other than his testimony to suggest that his condition has worsened since his alleged onset date. After his June 22, 2010, alleged onset date, saw Dr. Mohsen for an EMG due to complaints of back pain and leg numbness. He saw Dr. Karls to go over the results of his EMG and was prescribed Neurontin and Naprosyn (medication for nerve pain and a non-steroidal anti-inflammatory). There was no mention of shoulder pain or difficulty on this date. Ten months later plaintiff saw a doctor in connection with his disability case. His left shoulder flexion was 90° where normal is 150°. Abduction had the same reduced range of motion. The ALJ found that plaintiff can only occasionally reach with his left arm, which takes into account the limited range of motion in that shoulder. Dr. Demorlis, who saw plaintiff in connection with his disability claim, noted that while plaintiff claimed to be limited to standing for 45 seconds and sitting for 5 to 10 minutes,[10] he stood and sat for longer than that during the medical visit. He had tenderness in his thoracic area but no spasm and negative straight leg raising. Stanley Hutson, Ph.D., found no severe mental impairment. In March 2013 -- nearly two years

---

[10]I note that this contradicts plaintiff's hearing testimony when he stated that he can sit for 15 to 20 minutes at a time and stand for 5 minutes.

after his alleged onset date -- plaintiff had normal deep tendon reflexes, only mild tenderness over the lumbar spine, and "evidence" of neuropathy on examination. Plaintiff told Dr. Salma on this visit that Gabapentin had not helped in the past; yet he testified at the hearing that it did help, but once his worker's compensation benefits ran out he was no longer able to get that prescription. And despite plaintiff's argument that he only worked for 8 to 10 hours per week as a pastor, the evidence establishes that he estimated working at least 22 hours per week in that capacity and sometimes even more.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be

evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered:  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> As to credibility factors considered, the claimant's treatment was not what one would expect given his allegations of totally disabling pain and limitation of functioning.  In particular, at the hearing, the claimant testified that he has not regularly seen any of his physicians.  He admitted that he has not had extensive hospital visits or emergency care since his alleged date of onset. He admitted that he does not take any prescription medications to alleviate his pain; and instead relies on over-the-counter ibuprofen and naproxen to alleviate his pain and neuropathic symptoms.  He has not required any [regular] or aggressive treatment since his alleged date of onset.  For instance, since 2010, he has not participated in physical therapy, pain management, surgical intervention, or other homeopathic interventions, such as chiropractic care.  Instead, he testified that he has relied on home remedies, such as rest, and warm baths.  With this in mind, the claimant's allegations are not fully credible.

It is worth noting that the claimant reported that he has not had steady treatment due to his lack of medical insurance. The undersigned does not find this to be totally convincing. The claimant admitted that he has not looked into whether there is a sliding-scale community clinic in his community or a nearby community. While the claimant admitted that he did apply for Medicaid, he admitted that he has not looked into other community options, such as low-cost prescription plans through major retailers, such as Wal-Mart. He also admitted that he has not looked into whether there are other community resources through agencies, such as the county health department. Thus, the claimant's allegation that he [has] not sought regular treatment since 2010 due to lack of medical insurance is not entirely persuasive.

The claimant's admitted daily activities are not consistent with his allegations and suggest that he is capable of much more than he would lead one to believe. At the hearing, the claimant testified that in a typical day, he gets dressed and takes a bath independently. He prepares and eats breakfast. He reads the Bible and the news. He checks his email. He spends time talking on the phone to his family and members of his church. He goes out to restaurants to eat. He plays family board games. He does household chores, such as vacuuming. He testified that he got his hunting license and went deer hunting in the last year. He attends family events, such as family birthdays and holiday get togethers. He attends his son's extra-curricular activities, including his son's baseball games and basketball games. He has a valid driver's license and drives to his church. He has a job as a minister in a church and visits his congregation members during the week. He conducts funerals and other church events. He also teaches a substance abuse and anger management class on a weekly basis. The claimant also admitted to the consultative examiner that he was going to school for his associates degree in Science and substance abuse counseling starting in August 2011. The fact that the claimant is capable of sitting, standing, and walking sufficiently to perform these daily activities, suggests that he would be able to sit, stand, and/or walk sufficiently to perform a reduced range of work as stated in the residual functional capacity. It is also evidence that claimant's allegations are not entirely credible.

The third-party statement from the claimant's spouse also suggests that the claimant enjoys a wide range of activities. For instance, the claimant's spouse reported that in a typical day, the claimant watches the local news, reads the Bible, makes phone calls, does homework, goes to school, visits the sick and invalid, studies, does his online course work, watches documentaries, and teaches classes at church or in regards to substance abuse. She noted that the claimant also drives his children around as necessary, and helps them with schoolwork. She indicated that the claimant goes shopping for groceries and miscellaneous household items once a week. Considering these statements of

the third party, the undersigned finds the claimant's allegations not entirely credible.

The claimant had a history of steady work prior to 2008. However, he has also worked after the alleged onset date, which suggests that his limitations are not as limiting as alleged. The claimant admitted that he is a pastor in a church. He admitted that, as part of his job, he calls and visits members of his church, holds services, and conducts other religious events, such as funerals. While he reported that this work is not full-time in nature the work after the alleged onset nonetheless does not bolster the claimant's allegations that he suffers from a totally disabling degree of pain and limitation. As such, the claimant's allegations are not entirely credible.

(Tr. at 16-17).

### PRIOR WORK RECORD

The ALJ noted that plaintiff had a history of steady work prior to 2008, that he has worked after his alleged onset date which suggests that his limitations are not as limited as alleged, and that he is a pastor in a church. She noted that plaintiff calls and visits members of his church, holds services, and conducts other religious events, such as funerals.

In addition, plaintiff's wife observed that plaintiff suffers from "some depression" over the fear of "vocational change at mid-life." In his administrative paperwork, plaintiff expressed a "fear of inability or difficulty in changing vocations." The ALJ found that plaintiff cannot perform his past relevant work, which he did for 22 years. The record suggests that plaintiff's lack of work since his alleged onset date may be in part due to his reluctance to work in a different occupation rather than his inability to do any kind of substantial gainful activity.

### DAILY ACTIVITIES

The ALJ pointed out all of the activities plaintiff does with his church, his family, and taking care of himself. "The fact that the claimant is capable of sitting, standing, and walking sufficiently to perform these daily activities, suggests that he would be able to sit, stand, and/or walk sufficiently to perform a reduced range of work as stated in the residual functional capacity [assessment]." In his Work Activity Report plaintiff alleged working a total of 22.5 hours per week at the low end of his estimates. He is able to concentrate well enough to read the Bible and the news, study, attend classes, do homework, do online education courses, watch documentaries, and teach classes, in addition to his duties as pastor, according to his Function Report. He was able to drive to the administrative hearing, he alleged in his Function Report that he drives his kids to their appointments and to school, and he goes outside up to three times a day including walking and driving, all indicating that his peripheral neuropathy is not as bad as he alleges. In his Work History Report, he described his job as a pastor as visiting and praying with the sick, studying, preparing for sermons, delivering sermons, teaching lessons, supervising 2 to 3 people, and counseling people before and after church services, which requires a level of adaptability to change in work routines, memory and concentration. Both he and his wife reported in the administrative paperwork that plaintiff's impairments do not affect his ability to understand, follow instructions, remember, concentrate or get along with others. Plaintiff was able to take 10 college credit hours per semester in addition to acting as a pastor and caring for his family as described.

Case 6:14-cv-03229-REL   Document 21   Filed 07/13/15   Page 31 of 39

### DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Almost two years after his alleged onset date, plaintiff was taking no prescription medications and no over-the-counter medications for any of his symptoms. He had not checked into any low-cost prescription program such as that offered by Wal-Mart, and had not checked to see if there were any low cost, no cost, or sliding scale medical providers. The fact that plaintiff was able to go to college part time; work as a pastor part time; purchase gas to drive his car around to visit members of his church; maintain a computer with internet service to read the news, communicate via email, and take online college courses, all to the exclusion of attempting to obtain medical treatment for conditions he alleges are totally disabling, supports the ALJ's finding regarding plaintiff's credibility. In addition, a lack of insurance does not explain why plaintiff would not even be taking an over-the-counter non-steroidal anti-inflammatory, which is one of the two medications he had been told by his doctor to take for his allegedly disabling symptoms; yet, as of March 2013 Dr. Salma's records reflect that plaintiff was taking nothing over the counter for his symptoms.

### DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The record establishes that plaintiff did not regularly take any prescription or over-the-counter medications for his symptoms.

### FUNCTIONAL RESTRICTIONS

On October 18, 2010, plaintiff had an EMG which showed "lower extremity sensory motor polyneuropathy". Plaintiff saw Dr. Karls on December 29, 2010, to go over those results, but Dr. Karls did not recommend that plaintiff limit his activities in

any way as a result (including driving or walking). Nine months later Dr. Demorlis observed that plaintiff had normal gait and station, and on exam plaintiff's feet were perfectly normal with no paresthesia. No functional limitations were recommended. In March 2013 -- nearly 3 years after his alleged onset date -- plaintiff was diagnosed with peripheral neuropathy and lumbar radiculopathy, but no functional limitations were recommended. Despite having shoulder surgeries, plaintiff continued to drive and none of his medical records reflect that any doctor cautioned him against operating a steering wheel with his shoulder limitation. The medical evidence suggests that plaintiff's limitations from his impairments are not as severe as he alleges.

## B.    CREDIBILITY CONCLUSION

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not entirely credible.

## VII.    COMBINED EFFECT OF IMPAIRMENTS

Plaintiff argues that the ALJ erred in failing to consider the combined effect of all of his impairments, including his "severe depression" and midline focal disc protrusion at T7-T8. The records plaintiff discusses in this argument all predate his last denial of benefits except a medical review prepared by Edwin Wolfgram, M.D., a psychiatrist, which was not submitted to the Administrative Law Judge or the Appeals Council in this case but was attached as "new and material evidence" to plaintiff's brief.

While the evidence from the prior period can be considered as background evidence for a new claim, the previously adjudicated period is subject to res judicata.

Case 6:14-cv-03229-REL   Document 21   Filed 07/13/15   Page 33 of 39

Hillier v. Social Security Administration, 486 F.3d 359, 365 (8th Cir. 2007) (medical evidence submitted in prior proceeding could not be reconsidered in a new proceeding). The medical records that post-date the period covered by the previous disability case do not establish that plaintiff suffers from any greater limitation than that found by the ALJ, not due to his thoracic spine or any mental impairment.

The report by Dr. Wolfgram is dated May 14, 2014; however, plaintiff's last insured date was December 31, 2012. The report by Dr. Wolfgram is one paragraph long and reads as follows:

> I interviewed Mr. Hohman on April 4, 2014. I reviewed extensive medical reports on Mr. Hohman. He had extensive injuries secondary to his work as a painter. Rehabilitation was not successful. He has multiple physical and mental problems secondary to the injury. He is severely depressed and in pain. I determined that in the year of 2012 he was permanently and totally disabled with the work injuries as the prevailing cause.

There is no evidence that Dr. Wolfgram ever saw plaintiff prior to his last insured date, and there is no evidence that Dr. Wolfgram ever treated plaintiff. He does not indicate that he did anything other than review records and interview plaintiff; therefore, his opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques. Finally his opinion is not consistent with the record as a whole -- no doctor who saw plaintiff prior to his alleged onset date observed severe depression,[11] and plaintiff never alleged depression to any treating physician; and plaintiff's daily activities which include teaching substance abuse classes, working as a

_____

[11]Dr. Demorlis assessed depression based on his one-time examination during which he observed that plaintiff had a sad face; appeared preoccupied, impoverished, talkative; and had poor eye contact.

pastor, and attending college part time, are all inconsistent with Dr. Wolfgram's opinion. The opinion of a one-time consulting physician generally is not considered substantial evidence, particularly when it conflicts with the record as a whole. Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).

Dr. Wolfgram's opinion is not new and material evidence justifying a remand under 42 U.S.C. § 405(g). To be considered material, the new evidence must be "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied." Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997) (quoting Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993)). It must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits. Jones v. Callahan, 122 F.3d at 1154 (citing Woolf v. Shalala, 3 F.3d at 1215). As discussed above, this showing has not been met. Therefore, the issue of whether good cause[12] existed for failing to present this evidence is not relevant. However, in presenting this argument, plaintiff challenges the effectiveness of his attorney during the administrative proceedings.

Plaintiff's claim that he lacked competent counsel during the administrative process assumes that he had a fundamental right to counsel in seeking Social Security benefits. Banta v. Chater, 1995 WL 864573 (W.D. Okl., December 1, 1995). Without

---

[12]Because the issue of good cause is not relevant, plaintiff's affidavit in his reply brief does not support his argument. I do note, however, that plaintiff's affidavit contradicts his current argument. The affidavit is dated March 5, 2015, and states that plaintiff recently ran into someone at a class he was teaching. Dr. Wolfgram's opinion that plaintiff is totally disabled due to severe depression is not supported by plaintiff's admission in his affidavit just 4 months ago that he continues to teach classes.

35

such a right, deficient representation, even if proved, would provide no basis for

overturning the Commissioner's decision.  Id.

> Under certain circumstances, denial of effective assistance of counsel may violate the Sixth Amendment and the Due Process Clause of the Fifth or Fourteenth Amendment.  See, e.g., Roe v. United States (In re Grand Jury Subpoena Served Upon Doe), 781 F.2d 238, 246 (2d Cir. 1986) (en banc); United States v. (Under Seal) (In re Grand Jury Subpoena), 774 F.2d 624, 627 (4th Cir. 1985); Clark v. Maggio, 737 F.2d 471, 475 (5th Cir. 1984).  This is so, however, only if the person claiming a violation had a Sixth, Fifth or Fourteenth Amendment right to counsel at stake.  A Sixth Amendment right to counsel applies only in criminal prosecutions and attaches when adversary judicial proceedings are initiated. Roe, 781 F.2d at 244.  The right to counsel as an aspect of due process generally turns on whether the proceeding may result in a deprivation of liberty.  Walker v. McLain, 768 F.2d 1181, 1183 (10th Cir. 1985).

> The administrative process by which decisions concerning social security benefits are made does not require that a claimant have any attorney at all. . . . Given the nonadversarial nature of the administrative process, competent legal representation of the claimant during the process is not a prerequisite to issuance of a valid administrative decision.

> Moreover, when an appeal is taken from a final decision of the Commissioner, the purpose of judicial review is not to sanction the claimant's attorney for unprofessional conduct, to judge the effectiveness of the claimant's attorney under constitutional standards, or to provide advocacy for a claimant who has received inadequate legal services. The Court's only proper function when reviewing a denial of social security disability benefits is to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied.

Id.

Although ineffective assistance of counsel is rarely raised in Social Security

disability appeals, courts have routinely found such an argument meritless on the

ground that a Social Security claimant has no Constitutional right to counsel.  See

Russell v. Chater, 62 F.3d 1421, at *2 (8th Cir. 1995) (Russell's argument that she

received ineffective assistance from her retained counsel is not cognizable in this type

of action"); <u>Cornett v. Astrue</u>, 261 Fed.Appx. 644, 651 (5th Cir. 2008); <u>Brandyburg v. Sullivan</u>, 959 F.2d 555, 562 (5th Cir. 1992) ("The Supreme Court has never recognized a constitutional right to counsel at an SSA hearing."); <u>Holland v. Heckler</u>, 764 F.2d 1560, 1562 (11th Cir. 1985) (a claimant has "no constitutional right to counsel at a disability benefits hearing"); <u>Rosas v. Colvin</u>, 2014 WL 3736531 (C.D. Cal., July 28, 2014); <u>Alvernaz v. Colvin</u>, 2014 WL 1338314 (E.D. Cal., April 2, 2014) (no Sixth Amendment right to counsel in the social security context, thus no ineffective assistance of counsel claim); <u>Payne v. Astrue</u>, 2012 WL 1090054 (E.D. La., February 27, 2012) (claims for ineffective assistance of counsel in Social Security proceedings are summarily dismissed due to no Constitutional right to counsel); <u>Diggs v. Astrue</u>, 2011 WL 2447509 (D.N.J., June 14, 2011) ("Because there is no right to counsel in Social Security proceedings, and because Plaintiff chose counsel to represent her [in the] hearing before the ALJ on April 1, 2009, Plaintiff's contention that the Court should remand the matter to the ALJ for ineffective assistance of counsel is meritless." (citing <u>Dowd v. Comm'r of Soc. Sec.</u>, 2009 WL 2246153 at *6 (W.D. Pa., 2009) ("A social security claimant who was represented by counsel of his own choosing cannot at a later time complain that the representation was inadequate.")); <u>Cole v. Commissioner of Social Security</u>, 2010 WL 3782445 (N.D. Miss., September 20, 2010) (<u>Strickland v. Washington</u> test for ineffective assistance of counsel in criminal proceedings does not apply to Social Security cases).

37

## VIII.   WEIGHT GIVEN TO OPINIONS OF TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in failing to give great weight to the medical reports of the treating physicians, David Rogers, M.D.; Richard Johnston, M.D.; James P. Emanuel, M.D.; and Thomas Musich, M.D.  All of these records predate plaintiff's alleged onset date and fall within the time period covered by res judicata.  Therefore, plaintiff's argument is without merit.

## IX.   NON-EXERTIONAL IMPAIRMENTS

Plaintiff argues that the ALJ failed to consider the pain in upper extremities and back and its effect on his ability to perform sedentary or light work.  In support plaintiff points only to the one-paragraph conclusory report of Dr. Wolfgram, attached as new and material evidence to his brief, and repeats his credibility argument.  Both of those arguments have been addressed above and will not be repeated here. This argument is without merit.

## X.   NO OTHER WORK PLAINTIFF CAN PERFORM

Plaintiff argues that the Commissioner has not satisfied her burden of establishing that other jobs exist that plaintiff can perform because, "all three of the [jobs listed in the ALJ's order] require the use of both upper extremities for steadiness, fast, simple, repeated movements of fingers, hands, and wrists.  They also require the ability to bend, stretch, twist, or reach out with the body, arms, and/or legs." (Plaintiff's brief at page 26).

Plaintiff does not point to any evidence or any legal authority to support this argument.  After a thorough review of the evidence, I find that the ALJ's residual

functional capacity assessment is supported by substantial evidence and that the ALJ properly relied on the vocational expert testimony that plaintiff could perform the jobs noted in the ALJ's order.

## XI.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 13, 2015

39